Verbatim Record: Public Hearing and Decision on 17 Riley's Run (April 21, 2026)

**1. Opening of the Public HearingCHAIR:** How much—we're going to move into a public hearing. Uh, what do we have, 6:36? We're going to open the public hearing. This is in reference to, um, 17 Riley's 17 Riley's run.**MADAM CHAIR:** What we have is a public hearing that is required by law for, uh, the board to issue an order on a—on a undangerous hazardous building. With us tonight we have Mary, uh, Cosigan from Bernsteeen Shaw sic, our attorney; uh, Teresa Wil Wilson, the CEO; and James Bliss, the planning director. And I believe we have the attorney for the bank on Zoom, is that correct?**ANDREW SCHAEFER:** Hi there, Andrew Schaeer sic from Brock and Scott. Um, Freedom asked me to attend.**CHAIR:** Okay. And we have—I'm assuming several residents from Riley's run here. Okay. So let's begin. When you come up to the podium to speak, again, please, um, state your name, your, uh, residence. If you are a representative of legal or a company, then please state that. Probably should have our attorney start first. Yep. Floor.**2. Legal Framework and Process ExplanationMARY POST AGAIN sic:** Hi, Mary Post again sic. Um, I'll just talk about the process just so it's clear. So, the—the statute lays out a procedure for the—gives the, uh, select board the ability to declare a building dangerous, and that will then lead to various outcomes afterwards. And so what you're doing tonight is, um, taking testimony from the CEO and others regarding this building. Um, the result of—after hearing that would be a discussion as to leading to an order either declaring the building dangerous or not. Um, there are statutory standards. You have a draft order which kind of—which lays out those standards. So there's statutory standards you look at. Um, I can do— so it's—it's a—it's a nuisance within the—the statutory definitions. Um, I can—I can pull up that definition for you; i don't have it in front of me at the moment, but I can pull that up for you.Um, so essentially, it—it's—it's uninhabitable. It's a broadly, generally—not this building in itself is— is a hazard, um, is, um, a danger to community public health, other issues. You can declare it dangerous. After declaring it dangerous, if that's the path that you take, um, then the order will include a—an order to the property owner, um, as to what steps need to be taken—either whether it is fixable and some items to be fixed in the house, or whether it's to be demolished. And you give deadlines in that order. It's always recommended to do deadlines. This draft has, you know, some deadlines, but again, it is just a draft; it was just for your—for your use. Um, and—and it's all your decision. You can decide what you want to order.Um, and after you issue this order, um, the statute provides that if the owner does not do as ordered, the town has the authority to go in and take that action themselves. So you could go—if—if the order is to demolish the building, the town has the authority, after a deadline has passed, after an appeal period has passed, to go in and demolish the building, and then you charge the owner for the money that it costs to do that. If you don't get paid within 30 days, you put a special tax on the property and you collect the cost of doing that. And so that's how the—the process works.**MARY POST AGAIN:** So what will happen, which I recommend, is if you do an order tonight, um, and say your order is "yes, it's a dangerous building, we want you to do XYZ," and you set certain deadlines—once those deadlines have passed, I always recommend that the CEO come back and say, "the deadlines have passed, nothing has happened. What do he sic wants to do?" And that—at that point, you do have the order, you do have the authority to issue

an order to—for the town itself to take action.**CHAIR:** Okay. Any questions? Does anybody have any questions?**LINDA:** Um, I—I have a question. i'm just curious, if—if we end up having to take it over, it becomes our responsibility and our costs. We're then going to put a lean sic on the property, is that—**MARY POST AGAIN:** You assess a special tax, and if they don't pay the tax, then—then it turns into a lean sic. Yeah.**LINDA:** Where does the town fall on the list of people that have leans or owe? Because I'm assume—**MARY POST AGAIN:** Number one.**LINDA:** Number one? So we get paid before the mortgage company gets paid? Before the bank and everybody?**MARY POST AGAIN:** Okay, yep. And my understanding, there's someone from the bank here because it is in the early stages of foreclosure.**ANDREW SCHAEFER:** Yeah, and this Andrew Schaefer again. i'm not disagreeing with anything that I've heard so far, um, and it's—we filed a foreclosure complaint. We don't have judgment yet, so it's not our property to sell or—or really dispose of. Um, we have our mortgage that we're foreclosing on, but we're still in that—we're still in that stage.**3. Code Enforcement Officer (CEO) TestimonyTERESA WIL WILSON sic:** Good evening. i'm Terry Wilson. i'm the code enforcement officer for the town of Berwick. Would you like me to speak about the dangerous building and the timeline or what I observed?**CHAIR:** Okay.**TERESA WIL WILSON:** So the fire did break out on March 1st. Um, I was made aware of it, um, on March 2nd. That is a Sunday, March 1st. I went out to the dwelling on—as soon as I was made aware of it on March 2nd, which is Monday. Um, I wanted to see the condition of the building. i wanted to see, uh, what needed to happen. Um, so in my opinion, the building was a total loss. It was heavily damaged by fire. Um, I did speak with Chief Plant. Uh, there was many fire departments there, so there was extensive water damage as well. The back half of the roof is off of the house and, um, there were—I did encounter a person, excuse me, on the property at the time.**TERESA WIL WILSON:** So, um, I also noticed that there was a lot of debris on the ground from the fire, um, from the fire department, um, addressing the fire. So it also rendered the property to me unsafe. So I came back the following day and posted the property unsafe, because I—it—to me, it was very unsafe. Um, there was still people coming and going from the house. i did speak to neighbors who gave me firsthand account of, uh, persons coming and going to the property. Um, there's several abandoned cars on the property as well.**TERESA WIL WILSON:** Um, I was, um, um, emailed several times by one of the residents who was asking for access to the home to get his belongings. He was granted access over a 3-day weekend, um, and that would be the weekend immediately preceding March 16th. Um, I'm sorry, April—I had the building secured on March 16th, so he was given the weekend before that, uh, to secure any belongings that he needed to get. That gave him a three-day window to get his belongings. i do occasionally drive by the property when I'm in the area just to make sure that it's still secured and safe. i do see a—a car that was—what was—what I would deem a—a abandoned vehicle is now up on blocks in—in front of the house. And from what I understand—I wasn't a firsthand witness to this, but, uh—for the removal of a catalytic converter. So there is a—now a kind of a junked car in front of the house as well.**CHAIR:** So it wasn't up on blocks prior to the fire and now it is?**TERESA WIL WILSON:** No. Yes, exactly. So I do believe people are still coming going from the property. Um, I've, you know, I did walk the property just about a week ago and I could tell things—things are, you know, a little different. But so I do believe that people are coming and going from the property still. Uh, you should all have pictures of the—of what the residence looks like since the fire. So I have—everyone should have that package and then you

can see the condition of the house for yourself.**BOARD MEMBER:** On March 16th, you said you secured the property?**TERESA WIL WILSON:** i had a third party secure the property, yes.**BOARD MEMBER:** And what does that entail?**TERESA WIL WILSON:** Uh, just boarding up windows. Um, I had them temp erect kind of a temporary fence—it is made out of plywood—but just around the garage because there was so much debris on the ground, just to make the property a little bit more safe.**BOARD MEMBER:** Were signs put up that said "no trespassing" or anything like that?**TERESA WIL WILSON:** "No trespassing"—um, that's not something I would do, but "unsafe property," absolutely. Yeah. So those signs were put up.**CHAIR:** And then people still were coming and going?**TERESA WIL WILSON:** Yes, and—and you do have a picture with those signs, um, up in your photos. But yes, and people still came and were still coming and going. Okay. i don't—I do not see the, uh, the—the residences being, um, able to be rehabilitated at all or—or—or rebuilt. You know, repaired, I should say. i do believe it is a total loss.**CHAIR:** Total loss. Okay. Have you had any direct contact with the individual who's the owner?**TERESA WIL WILSON:** i have not.**CHAIR:** You have not. Okay.**TERESA WIL WILSON:** There are three owners. One is—**BOARD MEMBER:** Three owners?**TERESA WIL WILSON:** One is deceased.**CHAIR:** Okay. Wait, about the insurance company?**TERESA WIL WILSON:** The insurance company—i've been dealing with the mortgage company, not the insurance company. So we don't even know if there was insurance on the—on the property? No. If I could—if I could talk to an owner, you know, but unfortunately not able to do that. Um, I wonder if the mortgage company knows if there was insurance on the property. Is it insured?**4. Bank Representative and Ownership Discussion****ANDREW SCHAEFER (Bank Attorney via Zoom):** Um, Andrew Schaefer again. i don't—I don't have the precise insurance information available. i can look into that. We had also last year, um, we had gotten something from—I'm just looking—i think it was Rodney Downing, who's, um, one of the owners, had, uh, written to the—to the court after our foreclosure complaint was filed. And he said he lived there at 17 Riley's Run with his sister Mary Downing, his mother Linda Downing, and he wrote another household member, whoever that is.**TERESA WIL WILSON:** Okay. Likely Darren Guay. Dar—would you say Darren Guay?**ANDREW SCHAEFER:** Okay. And that was—but I mean, that was obviously—that was last year.**TERESA WIL WILSON:** But, uh, right. Linda Downey sic no longer lives in the home. She is in a—in assisted living in South B. Note: Referred to as 'South Bark' later in the transcript. Okay. There are other children, but, u, Mary is—is not on the deed. Um, Rodney is on the deed, the mom Linda, and the deceased husband is on. And the mortgage—when they took out the original mortgage, did they have to provide insurance? Would that be—I mean, that—that would be—like I said, I—I don't know the specifics, um, at the moment, so I can look into it. That would be the typical expectation.**CHAIR:** Because of the situation, do you think the—that the people that are aware of the fire or what have you, they just haven't contacted the insurance company?**TERESA WIL WILSON:** So because I can't have any firsthand, uh, real conversations, things have been done through email and, um, I can't converse with the mom. The mom is not, um, mentally sound to have a—to talk about it. Um, so that leaves two other, you know, that leaves Rodney. The—the husband's deceased and Rodney is apparently—I've called his—he has a cell phone but it's never on. i've called it many times and apparently he just doesn't even turn the cell phone on unless he's going to use it, then I'll turn it on, use it, and then shut it back off. So I—I haven't, um, been able to talk to—to Rodney or Linda, the mom. Um, who I do hear from frequently is the rent—is from the tenant,

from Darren. Although I haven't heard from him recently. He was demanding access to the—to the home and they—was—they were granted access, like I said. I gave them a 3-day window to retrieve their belongings.**5. Public Testimony: Neighbor Concerns**

### Mark Davis (22 Riley's Run)

**MARK DAVIS:**  My name is Mark Davis, i live at 22 Riley's Run, just next door. And it probably blew up because they were cooking meth. This has been a drug house for, I think, about six years. They've been trafficking drugs out of there and you can look to the police department and figure it out. i'm just curious how long the process is going to get drawn out with the foreclosure through the bank. It's been, I don't know, almost a year now, I—I believe, since they filed that. How long is this going to take? Another year? i know the state of Maine, it takes two years before they can foreclose. Maybe I'm wrong. Maybe he could answer that.**ANDREW SCHAEFER (Zoom):**  Um, it's going to sound like I'm passing the buck and I honestly don't mean to. Uh, so bear with me briefly. It looks like the complaint was dated May 15, 2025. And, okay, there was a—like I mentioned earlier, there was a letter that came in from the borrowers a couple months after that asking to file a late answer and appear in mediation... which is what's called the foreclosure diversion process... that's—that's just a slow-moving process generally... they just—they just have—they just have a certain amount of bandwidth in York County at Bedford sic to do that... I think—I think reading between the lines, I think it's safe to say that this house is going to get demolished at some point in the, you know, in the not-so-distant future.

### Richard Hopley (20 Riley's Run)

**RICHARD HOPLEY:**  Good evening. Richard Hopley, 20 Riley's Run. We're right across the street. Um, that was—what the last bit of information was something I was concerned about because given the history over the last six years, it would not put it past the tenants—i'll use the t term, not Rodney, obviously not Linda witnesses—but the tenants to, um, if they were given permission to access the property, I could see a camper, I could see a tent, I could see the comingings and goings continuing. Um, I think the town should be aware of that. And certainly if you want any information on what's been going on over six years, your police department will—will have a folder.

### Joanna Walker (18 Reagan Lane)

**JOANNA WALKER:**  Joanna Walker, 18 Reagan Lane. My property backyard borders the property we're talking about and I just want to reiterate what my neighbors said. The concern about, um, them moving into the woods, living in the tents, is a big concern. I have two young kids and we've had history of people under influence of drugs being in the woods with flashlights coming up to our property. We had to call police several times and it's a serious concern of them moving in. There was tepee set up there, tents and things like that. So allowing them to access the property, especially as the summer and warm weather is coming, um, it's a significant risk of them just coming and moving in now.**6. Board Deliberation: Site Security and Statutory Definition****CHAIR:**  I'm going to close the public hearing so we can make a—a decision... 7:11, public hearing is closed.**MARY POST AGAIN:**  Madam Chair, if I might, yes, I did find the—the statutory definition for dangerous building. So if you—if I can just read that so it's in your minds when you're kind of deliberating. Um, so the definition of—of dangerous

building under the statute is:"A building which is structurally unsafe, unstable or unsanitary; constitutes a fire hazard; is unsuitable or improper for the use or occupancy to which it is put; constitutes a hazard to the health or safety because of inadequate maintenance, dilapidation, obsolescence or abandonment; or is otherwise dangerous to life or property."**CHAIR:**  Under the, um, on the first page there under the, um, list of evidence... there's—um, no sanitary access, there's no water as depicted. Yeah, that the building is unsafe in the fact that the building is pretty much burned to the ground so it's unstable. There is significant debris around the building... When you say three acres, the access to the three acres, there's no fencing, there's no signage, so that technically could be public access. So that would be a concern in the fact that you talk about tenants, but what about teenagers on the property just going to check it out? So that would—would that give us justification... could we then justify the entire—the entire three acres?**MARY POST AGAIN:**  Sure. If—if you find that accessing that acreage is a dangerous situation, you could put as part of your order that no one is to enter any of that property and you can order the code enforcement officer to post it and enforce it.**CHAIR:**  Okay. And I'm—similar that to like a pool, you have to have a fence around a pool even though—so we could—Yeah. Okay. I'm—I'm talking about the fact that there is no fence therefore anybody like teenagers could go onto the property go into the demolished the house that is not safe... because there's no preventing access.**BOARD MEMBER:**  I assume it's like hunting, you could post signs every so many feet and that would cover your...**TERESA WIL WILSON:**  I have posted the property itself unsafe but not every access point because, like I said, it has a lot of frontage and so, um, you would leave a lot of signs all along that.**CHAIR:**  But we could do that in our order?**MARY POST AGAIN:**  Yes, we could.**CHAIR:**  Unsanitary, unsafe, uninhabitable. Yep. No electrical... Electricity. I just add "property not fenced." Yep. What about these—the vehicle that is on there... it's up on blocks?**TERESA WIL WILSON:**  Yes.**CHAIR:**  Okay, that's another reason why that's not safe. So therefore nobody should have access to the property.**7. Discussion of Demolition Deadlines**MARY POST AGAIN:**  No later than May 21st, make arrangements to have a building—building demolished as soon as possible. You know, some towns do that because they know that, you know, it's a busy season and you can't necessarily hire somebody to come tomorrow... i don't know if that's the case... I wanted it to be a reasonable deadline so they can't come back and say there's no—that was no way we can meet that deadline.**CHAIR:**  So I'm going to make the suggestion to the board that we give a deadline of Tuesday, May 19th.**LINDA:**  Reasonable—that's—that's one of those words that— okay, it's reasonable for me to say I'm going to have it done next year. Can we put some parameters on that and also require that whomever they hire to do the demo, if they do that, we have documented proof that they're actually hired to do the demo... that the company is insured and in fact contracted to demolish the building?**MARY POST AGAIN:**  Let's plug in, you know, a June date where the building has to be actually down instead of "reasonable time."**CHAIR:**  So they must—they must have a plan by May 19th. It must be demolished by June 19th. An exception will be considered if plans, um, and a contract can be provided showing an actual date to be come down, but no longer than—no longer than July 19th at this point. That's three months.**8. Formal Motions and Final VotesCHAIR: I make a motion that we Excuse me sorry no no please go ahead may 19th to as written as my first sentence to make arrangements to have a building demolished yes yes sorry um so yes no later than May and I'm going to say than I'm not giving me any extra day so no later than May 19th make**

**arrangements to have the building demolished as soon as possible contact a code enforcement officer no later than uh May I'm going to say first on this since we're bouncing that back may 1st to inform the office of the arrangements that have been made for the demolition if there are personal items in the building that you plan to remove before demolition you must schedule that in advance with the town and you must be accompanied by a representative from the town in order to access the building and remove said items in addition the demolition must be supervised by a third-party representative of the town and you shall reimburse the town for the cost of that third party... The decision may be appealed to the superior court under the main rules of civil procedure rule 80B if you fail to meet the above deadlines and or fail to demolish the building within a reasonable time and no timely appeal is taken the town may demolish the building at the town's expense and recover all expenses including reasonable attorney fees by means of a special tax or civil action.BOARD MEMBER:** Second.**CHAIR: Further, I will amend i will amend my motion to add that... that the property owners notify the town of the company selected to make the demolition that that company is insured and in fact contracted to demolish the building at said residence... So let me put the this then so they must they must have a plan by May 19th it must be demolished by June 19th an exception will be considered if plans um and a contract can be provided showing an actual date to be come down but no longer than no longer than July 19th at this point that's three months.BOARD MEMBER:** Second the amendment.**CHAIR:** Because we have someone on Zoom, we have to do a call.

- **CHAIR:** Mike?
- **MIKE:** Yes.
- **CHAIR:** Lisa?
- **LISA:** Yes.
- **CHAIR:** Linda?
- **LINDA:** Yes.
- **CHAIR:** Jeff?
- **JEFF:** Yes. *(Motion approved 4-0).***CHAIR: I will also make a motion that we declare the building unsafe for occupancy or dangerous or unsafe and dangerous and unhabitable sic... due to the conditions that were listed in the order and everything we've said covers the entire property.BOARD MEMBER:** Second.**CHAIR:** Go for a vote.
- **CHAIR:** Mike?
- **MIKE:** Yes.
- **CHAIR:** Lisa?
- **LISA:** Yes.
- **CHAIR:** Linda?
- **LINDA:** Yes.
- **CHAIR:** Jeff?
- **JEFF:** Yes. *(Motion approved 4-0).***9. Concluding Remarks for 17 Riley's Run SectionCHAIR:** It has been moved, seconded, and approved to declare the building unsafe and to also move forward with the motion to demolish the building. Um, Mike, you are out of town correct? So you're not going to be around tomorrow? Could we change

the name with your name and will you be able to stop in tomorrow to sign it—sign the order?**MIKE:**  Yes, I can yep. I can do that, yes.**CHAIR:**  Thank you. Next order of business: reports of any committees. Thank you all for coming out, we greatly appreciate it. Thank you. Have a good evening. Appreciate your hard work. Thank you.